## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **MICHELLE SORBER, TONY HERNANDEZ, DANIEL CHILDERS, DON HART, HAROLD DICKERSON, WILLIAM MELTON, MARGRET MELTON, ZINMON WHITTER, MOSES SIFUENTEZ, ARMANDO GONZALEZ, JERRY HEAD, HOWARD PERRY, and MARTHA MOORE, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JULIUS MOORE,** | § § § § § § § § § § § § | **Case No.  A-18-CV-1088-SH** |
| *Plaintiffs* | § § | |
| **v.** | § § | |
| **SECURITY WALLS, LLC,** | § § | |
| *Defendant* | | |

## O R D E R

Before the Court are the Plaintiffs' Motion for Partial Summary Judgment, filed January 3, 2020 (Dkt. No. 33); Defendant's Motion to Exclude Testimony from Plaintiffs' Expert, Dr. David Jones, and Request for Hearing, filed January 9, 2020 (Dkt. No. 34);[1] and the related response and reply briefs. The parties consented to proceed before a Magistrate Judge on February 24, 2020. Dkt. No. 75.

### I.    Background

Defendant Security Walls, LLC is a contractor for security guard and private investigation services. In December 2013, the Internal Revenue Service awarded Defendant a contract to provide security guard services at its facilities in Austin, Texas ("the IRS Contract"). Dkt. No. 33 at 1;

---

[1] Pursuant to Rule CV-7(h) of the Local Court Rules of the United States District Court for the Western District of Texas, the Court finds this matter suitable for disposition without a hearing. Accordingly, Defendant's request for a hearing is **DENIED**.

Dkt. No. 51 at 3. Defendant officially replaced the previous contractor for security services, S&K Aerospace, LLC ("S&K"), on March 1, 2014. *Id*. The Plaintiffs are thirteen individuals who were employed as security guards at the Austin IRS offices by S&K but denied continued employment by Defendant.[2]

Plaintiffs' claims revolve around certain medical examinations and physical fitness tests Defendant ordered that all applicants, including incumbent security guards, must complete to be considered for a security guard position at the Austin IRS facilities. *See* Dkt. No. 33 at 6-11; Dkt. No. 33-8. The IRS Contract established certain medical and physical fitness standards required of all security guards. *See* Dkt. No. 33-2. The Contract provided that: "All prospective employees must undergo a pre-employment medical/physical examination. A licensed physician shall administer examinations. . . . Failure by a guard to meet any of the required medical qualifications may result in the guard being disqualified from performing under the contract." Dkt. No. 33-2 at 1. If a security guard did not pass the examination or test, the IRS Contract provided that the examining physician could certify that the security guard was qualified for the position despite the results. *Id*.

In December 2013, Defendant arranged for third-party medical facility St. David's Occupational Health Services ("OHS") to develop and administer the pre-employment medical examinations and physical fitness tests. Dkt. No. 33-4. Defendant gave OHS the medical and physical standards listed in the IRS Contract and had OHS make testing recommendations. Dkt. No. 33-6 at 13:24-15:8; Dkt. No. 33-7. Defendant rejected OHS's recommendation to use standard law enforcement agency tests based on cost, and instead followed OHS's alternative

---

[2] Plaintiff Martha Moore appears as the personal representative of the estate of Julius Moore, who was employed as a security guard at the Austin IRS facilities and who sought and was denied employment with Defendant. Julius Moore passed away on May 22, 2018. Dkt. No. 1 at ¶ 5.

recommendation to use the examination and fitness assessment for U.S. Customs and Border Patrol agents. Dkt. No. 33-4.

Medical assistants at OHS conducted the medical examinations and physical fitness tests in December 2013 and January 2014. Dkt. No. 33-6 at 30:25-31:22; Dkt. No. 51-3. The security guards first had a medical examination, which consisted of vision, hearing, blood pressure, EKG, and other tests. *See* Dkt. No. 33-8; Dkt. No. 51 at 5-6. If the security guard passed the medical examination, he or she was allowed to take the physical fitness test, which consisted of completing twenty push-ups within one minute, twenty-five sit-ups within one minute, and a five-minute step test. *Id.*; *see also* Dkt. No. 51-14 at 53:4-18. On Defendant's instructions, the OHS medical assistants administered the tests on a pass/fail basis. Dkt. No. 33-6 at 31:18-22, 34:15-35:4.

Nine of the plaintiffs[3] passed the medical examination but failed the physical fitness test. Dkt. No. 1 at ¶ 18. One of the plaintiffs, Howard Perry, failed the medical examination and thus was not given the physical fitness test. Dkt. No. 1 at ¶ 19. Plaintiff Michelle Sorber did not take the medical examination or the physical fitness test because Defendant rejected her requests for testing accommodations for her alleged disabilities. Dkt. No. 1 at ¶ 20. Plaintiffs William Melton and Margaret Melton did not take the medical examinations or the physical fitness tests because their young son was in the hospital. Dkt. No. 1 at ¶ 21. None of the Plaintiffs were offered continued employment with Defendant. Dkt. No. 33-5 at 37:4-25.

In replacing S&K and filling security guard positions, Defendant was required to follow Executive Order 13495, Non-Displacement of Qualified Workers under Service Contracts (the "Executive Order").[4] Exec. Order No. 13495, 74 Fed. Reg. 6103 (Jan. 30, 2009); Dkt. No. 1 at

---

[3] Tony Hernandez, Daniel Childers, Don Hart, Harold Dickerson, Zinmon Whitter, Moses SiFuentez, Armando Gonzalez, Jerry Head, and Julius Moore.

[4] Executive Order 13495 has since been rescinded by President Trump but was in effect during the time relevant to Plaintiffs' claims.

¶ 42. The Executive Order provided that "under a contract that succeeds a contract for performance of the same or similar services at the same location," the successor contract shall "offer those employees (other than managerial and supervisory employees) employed under the predecessor contract whose employment will be terminated as a result of the award of the successor contract, a right of first refusal of employment under the contract in positions for which they are qualified." Consequently, under the Executive Order, Defendant was required to offer employment to Plaintiffs as incumbent employees, as long as they were qualified for the security guard position. Plaintiffs contend that despite being incumbent employees qualified for the position, Defendant failed to continue their employment based on unlawful and discriminatory hiring practices.

Plaintiffs allege that Defendant violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12117 ("ADA"), by subjecting them to prohibited pre-offer medical examinations, refusing reasonable requests for testing accommodations, and discriminating against them based on disability or perceived disability. Plaintiffs further allege that the challenged testing had a disparate impact on women, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), and on individuals over the age of 40, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-630 ("ADEA").

Plaintiffs, as a class, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of disability, age, and sex. Dkt. No. 1 at ¶ 29. On July 6, 2018, the EEOC found that there was reason to believe violations had occurred under the ADA. *Id*. at ¶ 31. The EEOC did not make any findings on Plaintiffs' allegations of sex and age discrimination. *Id*. at ¶ 32. The EEOC issued a Notice of Right to Sue Letter on September 27, 2018. *Id*. ¶ at 33.

Plaintiffs filed their complaint on December 14, 2018.[5] Dkt. No. 1. On January 3, 2020, Plaintiffs moved for partial summary judgment as to Defendant's liability under Section 12112(d) of the ADA, Title VII, and the ADEA. Dkt. No. 33. Defendant opposes the motion (Dkt. No. 51) and objects to Plaintiffs' summary judgment evidence (Dkt. No. 52). Defendant also filed a motion seeking to exclude the opinion of Plaintiffs' expert, Dr. David Jones. (Dkt. No. 34).

## II.    Motion to Exclude

Because Jones's expert report is among the evidence Defendant objects to as summary judgment evidence, the Court addresses the motion to exclude Jones's opinion first.

### A. Legal Standard

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. After *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness

> qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins*

---

[5] On March 18, 2020, Plaintiffs filed an Amended Complaint, which became the active pleading in this case. Dkt. No. 76. The Court addresses the Amended Complaint below.

*v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-96). "The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that the testimony is reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

*Daubert* sets forth four specific factors that the trial court ordinarily should apply when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability, however, is "flexible," and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142. Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden

of proof are the traditional and appropriate means of attacking shaky but admissible evidence."
*Daubert*, 509 U.S. at 596.

## B. Analysis

Plaintiffs retained Dr. David Jones to conduct an adverse impact analysis of the tests used by Defendant and offer an opinion on whether the tests were valid and job-related. Dkt. No. 34-2. Defendant argues that Jones's testimony relating to any disparate/adverse impact statistical analysis should be excluded because (1) Jones is not qualified to give such testimony, and (2) his opinion is unreliable.

### 1. Expert Qualification

Defendant argues that Jones's opinions on any statistical or other adverse impact analysis should be excluded because he is not qualified to give expert testimony on statistical analysis. Dkt. No. 34 at ¶ 10. Defendant asserts that Jones is unqualified because he is neither an economist nor a statistician and has not had any formalized training in statistics since completing his graduate studies in 1976. *Id*. Defendant also bases its argument on the fact that Jones did not perform the standard deviation computations described in his expert report, but testified that his colleague performed the calculations using online software. *Id*. Jones also testified that he did not independently verify the formulas or standard deviation calculations. *Id*.

Plaintiffs respond that Jones never intended to offer testimony regarding standard deviation analysis. Dkt. No. 50 at 3-4. Rather, Plaintiffs argue, Jones's adverse impact opinion relies on his analysis under the EEOC's interpretative rule for identifying adverse impact in employee selection procedures, set out in the *Uniform Guidelines on Employee Selection Procedures* and known as the four-fifths rule. *Id*. at 4. Plaintiffs argue that Jones's education, training, and experience qualify him to testify about his adverse impact analysis under the four-fifths rule, and Defendant has offered no evidence to indicate otherwise. *Id*. The Court agrees.

To establish that an expert is qualified, the proponent must demonstrate that the expert possesses a higher degree of knowledge, skill, experience, training or education than an ordinary person. *See* FED. R. EVID. 702. Jones holds a Ph.D. in Industrial Organizational Psychology and specializes in designing, validating, implementing, and evaluating employment testing and selection systems. Dkt. No. 33-10 at 21. Jones also has more than twenty years of experience serving as an expert witness on employment testing. Dkt. No. 33-10 at 27-30; Dkt. No. 50 at 2-3. "As long as some reasonable indication of qualification is adduced, the court may admit the evidence without abdicating its gate-keeping function." *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999). Moreover, an expert witness is not "strictly confined" to his or her area of practice and may testify concerning related applications. *Perez v. City of Austin*, 13 (W.D. Tex. May. 5, 2008). Jones's expertise on employment testing and legal compliance with the EEOC's *Uniform Guidelines on Employee Selection Procedures* necessarily includes adverse impact analysis under the EEOC's four-fifths rule. The Court finds that Jones is qualified to testify.

### 2. Reliability

Defendant next argues that Jones's testimony on adverse impact and statistical analysis should be excluded because it is unreliable. Dkt. No. 34 at 6. Defendant contends that Jones's opinion is unreliable for three reasons: (1) it is based on insufficient facts and data, (2) it is not the product of reliable principles and methods, and (3) Jones did not reliably apply the principles and methods to the facts of this case. Dkt. No. 34 at ¶¶ 6-10.

Defendant asserts that Jones's opinions are based on insufficient facts and data because Jones compared an incomplete data set. Dkt. No. 34 at ¶¶ 14-15. Jones compared the number of incumbent employees in each protected group who took the test to the total number of incumbent employees who took the test. *Id.* at ¶ 14. Defendant argues that the proper comparison data set

should have included all qualified applicants who took the test, not just incumbent employees. *Id*. at ¶ 15. Defendant further complains that Jones used an inaccurate data set, citing discrepancies in the numbers of female incumbents who took the test listed in the sources Jones used. *Id*. at ¶ 16. Plaintiffs respond that any deficiencies or inaccuracies in the data are Defendant's fault, as Plaintiffs received the data from Defendant. Dkt. No. 50 at 4-6.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Jones's reliance on a data set including only incumbent employees rather than all applicants does not disqualify him. Similarly, the fact that there are discrepancies in the data Jones bases his opinion on is not a ground for excluding his opinion. *See Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 250 (5th Cir. 2002) ("The fact-finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate.").

Defendant next challenges the reliability of Jones's opinion by arguing that he did not use reliable principles and methods. Dkt. No. 34 at ¶¶ 18-22. Specifically, Defendant asserts that the four-fifths rule is an improper and unreliable method in this case due to the small sample size. *See id*. at ¶¶ 19-21. Defendant cites *Deshields v. Baltimore City Fire Dept.*, 884 F.2d 1387 (4th Cir. 1989), as support for its statement that "courts have expressly rejected application of the four-fifths rule, particularly where the sample sizes are small." Dkt. No. 34 at ¶ 20. The Court in *Deshields*, however, did not exclude the expert's opinion based on its use of the four-fifths rule. Rather, the

Court admitted and considered the opinion and analysis under the four-fifths rule and subsequently concluded that a violation of the four-fifths rule alone was not sufficient to establish a prima facie case of discrimination under Title VII, noting its unreliability in small sample sizes. *Id*. at 1387. As Plaintiffs point out in their response, Defendant fails to cite to any cases where a court excluded an opinion on the basis of using the four-fifths rule. Dkt. No. 50 at 8. Defendant's arguments regarding Jones's use of the four-fifths rule and the size of the sample pool affect the weight of Jones's opinion, not its admissibility.

Finally, Defendant argues that because the standard deviation calculations were performed by Jones' colleague using online software, Jones has not reliably applied the principles and methods to the facts of this case. Dkt. No. 34 at ¶ 23. As Plaintiffs have indicated, Jones does not intend to offer an expert opinion on standard deviation, and, therefore, Defendant's argument as to its reliability is moot.

Based on the foregoing, Defendant's Motion to Exclude Testimony from Plaintiffs' Expert, Dr. David Jones, and Request for Hearing (Dkt. No. 34) is **DENIED**.

### III.    Motion for Partial Summary Judgement

Plaintiffs seek partial summary judgment establishing Defendant's liability for Plaintiffs' unlawful medical examination claim under § 12112(d) of the ADA, as well as their claims under Title VII and the ADEA. Dkt. No. 33. Plaintiffs' Motion for Partial Summary Judgment is based on their Original Complaint, which has been superseded by Plaintiffs' Amended Complaint, filed March 18, 2020. *See* Dkt. Nos. 1, 33, 76. Having reviewed the complaints, the motion, and the related filings, the Court finds that Plaintiffs' arguments apply equally to their Amended Complaint. Accordingly, the Court decides the partial summary judgment motion as presented. *See Zavala v. Carrollton-Farmers Branch Indep. Sch. Dist*., 2017 WL 3279158, at *1 n.1 (N.D. Tex. Aug. 2, 2017).

## A.   Legal Standards

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution could affect the outcome of the action." *Dean v. Phatak*, 911 F.3d 286, 291 (5th Cir. 2018). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. A court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party does not bear the ultimate burden of proof, after it has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 587. When the movant bears the burden of proof, the movant must establish all essential elements of the claim warranting judgment in the movant's favor. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). In such cases, the burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).

Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise

11

manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000).

## B. Objections to Summary Judgment Evidence

Defendant objects to two of Plaintiffs' exhibits in support of their summary judgment motion. Dkt. No. 52. First, Defendant objects to the Pass/Fail Chart attached as Exhibit 9 (Dkt. No. 33-9). Defendant asserts that the Chart is not proper summary judgment evidence because Plaintiffs did not lay a proper foundation for its admission, it is not presented in a form that would be admissible at trial, and because the Chart has not been properly authenticated. Dkt. No. 52 at 2.

At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017); *see also* FED. R. CIV. P. 56(c). Rather, summary judgment evidence must be capable of being presented in a form that would be admissible at trial. FED. R. CIV. P. 56(c)(2); *see also Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 354-55 (5th Cir. 2017). Accordingly, Defendant's arguments regarding the lack of foundation or the admissibility of the form of the Chart do not establish that it should be stricken from consideration. *See Lee*, 859 F.3d at 354. Likewise, lack of authentication fails to demonstrate that this evidence is inadmissible at trial. Defendant has made no showing that the substance or content of the Chart is incapable of admission at trial. The Court denies Defendant's motion to strike the Chart (Dkt. No. 33-9) from consideration.

Defendant also objects to the expert report of Dr. David Jones (Dkt. No. 33-10). As discussed above, the Court overrules Defendant's objections regarding Jones's qualifications and the reliability of his opinion. *See* Section II *supra*. Defendant further objects to Jones's report on the basis that it has not been authenticated and is not in admissible form for trial. Dkt. No. 52 at 2. The

Court rejects these arguments for the same reasons outlined above. *See Patel v. Texas Tech Univ.*, 941 F.3d 743, 746-47 (5th Cir. 2019) (finding that district court erred in declining to consider expert reports solely because they were unsworn, without considering whether those opinions were capable of being presented at trial in an admissible form). Accordingly, Defendant's objections to Jones's expert report (Dkt. No. 33-10) are overruled.

## C. Analysis

Plaintiffs move for summary judgment with respect to Defendant's liability under § 12112(d) of the ADA, Title VII, and the ADEA. The Court assesses the claims in turn.

### 1. Section 12112(d) of the ADA

Section 12112(d) of the ADA regulates the use of medical examinations and disability-related inquiries by employers at three stages of the employment process: (1) prior to an offer of employment; (2) after a conditional offer of employment, but before hiring; and (3) during employment. 42 U.S.C. § 12112(d).

During the pre-offer stage, a prospective employer may not ask a job applicant to undergo a medical examination or make inquiries as to whether he or she is an individual with a disability. 42 U.S.C. § 12112(d)(2)(A). The relevant EEOC guidance defines "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health," and identifies several factors bearing on this determination:

> (1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.

EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act* (July 27, 2000) ("EEOC, *Medical*

*Examinations Guidance*"), http://www.eeoc.gov/policy/docs/guidance-inquiries.html.[6] At the pre-offer stage, a prospective employer may have applicants complete physical ability or physical fitness testing as long as that testing does not constitute a medical examination. *Id.; see also Buchanan v. City of San Antonio*, 85 F.3d 196, 199 (5th Cir. 1996); *Malone v. Greenville Cty.*, No. 6:06-2631-RBH, 2008 WL 4557498, at *5 (D.S.C. Aug. 11, 2008). Physical fitness tests, however, must comply with the ADA's general prohibition of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities" unless the prospective employer can show that the test is "job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

Once a conditional offer of employment has been made, employers may require medical examinations if all entering employees are subject to the examination. 42 U.S.C. § 12112(d)(3). At the post-offer stage, if a medical examination screens out individuals with disabilities, the employer must show that the screening criteria are job-related and consistent with business necessity. 42 U.S.C. § 12112(b)(6); Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. §§ 1630.13, 1630.14(b)(3). A plaintiff need not be disabled to bring a claim based on an unlawful medical examination or disability inquiry under § 12112(d). *Taylor v. City of Shreveport*, 798 F.3d 276, 284 (5th Cir. 2015). The plaintiff must, however, establish that the violation caused some sort of tangible injury. *See Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 561 (5th Cir. 1998). The ADA also requires a causal link between the violation and the damages sought by the plaintiff. *Buchanan*, 85 F.3d at 200.

---

[6] EEOC Guidance materials are entitled to respect, but not full deference. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002).

Plaintiffs argue that Defendant is liable under ADA § 12112(d) as a matter of law because it required them to undergo medical examinations and physical fitness testing during the pre-offer stage and, as a result of that testing, Defendant chose not to continue their employment. Dkt. No. 33 at 7-10. According to Defendant, Plaintiffs' motion should be denied because Plaintiffs have not offered competent summary judgment evidence establishing the requisite elements of injury and causation. Dkt. No. 51 at ¶¶ 5-13. Defendant further contends that there is a fact issue as to whether Plaintiffs received conditional offers of employment before the testing. *Id*. at ¶¶ 24-26.

Because whether Plaintiffs received offers of employment dictates the nature of the protections afforded as to medical examinations and inquiries, the Court first examines Defendant's argument regarding conditional offers. *See* 42 U.S.C. § 12112(d); 29 C.F.R. § 1630.14.

### a.   Plaintiffs Did Not Receive Conditional Offers of Employment

Defendant asserts that there is a fact issue whether Plaintiffs received conditional offers of employment before the challenged medical examinations and physical fitness testing. Dkt. No. 51 at ¶ 24. Defendant cites testimony from its Security Operations Manager, Scott Carpenter, that he met with some of the Plaintiffs to discuss their right of first refusal and make sure they understood that they needed to submit applications. *Id*. at ¶ 25; Dkt. No. 51-3 at 28:6-20. Defendant also relies on testimony from one of the Plaintiffs, Harold Dickerson, that a copy of the Executive Order had been posted at the Austin IRS facility's control center, and that he generally understood that he had a right of first refusal and would be hired by Defendant if he completed all training and passed the medical examinations and physical fitness tests. Dkt. No. 51-8 at 21:9-24:21. Defendant argues that because Plaintiffs understood they had a right of first refusal under the Executive Order and were advised that they would be required to submit applications and pass medical examinations,

physical fitness testing, and background checks to be hired, Plaintiffs clearly understood that they had conditional offers of employment. Dkt. No. 51. at ¶ 25; Dkt. No. 33-18 at ¶ 9.

The EEOC provides the following guidance:

> Since an employer can ask disability-related questions and require medical examinations after a job offer, it is important that the job offer be "real." A job offer is "real" if the employer has evaluated all relevant non-medical information which it reasonably could have obtained and analyzed prior to giving the offer.

EEOC, *Enforcement Guidance: Preemployment Disability-Related Inquiries and Medical Examinations* (Oct. 10, 1995) ("EEOC *Preemployment Guidance*"), https://www.eeoc.gov/laws/ guidance/enforcement-guidance-preemployment-disability-related-questions-and-medical.  Thus, if a job offer is conditioned not only on the applicant successfully passing a medical examination but also on other, non-medical screening tests or requirements, the offer is not "real." *O'Neal v. City of New Albany*, 293 F.3d 998, 1008 (7th Cir. 2002); *Buchanan*, 85 F.3d at 199. In other words, an employer must have the applicant complete all non-medical portions of the application process before it can require that employee to undergo a medical examination. If other requirements such as a personal interview or background investigation remain when the offer is made, then the offer is not "real," and the employer is prohibited from requesting the applicant complete a medical examination. *See Leonel v. American Airlines, Inc.*, 400 F.3d 702, 708 (9th Cir. 2005).

None of the evidence proffered by Defendant demonstrates that real, conditional offers of employment were made to Plaintiffs. Plaintiffs' awareness of the Executive Order, the right of refusal for incumbent employees, and conditional requirements that would be imposed do not equate to a conditional offer of employment. *See* EEOC *Preemployment Guidance.* Moreover, any alleged oral conditional offers of employment made during initial transition meetings with incumbent guards cannot be considered "real" offers for the purposes of the ADA because

16

Defendant had not evaluated all other hiring information and had not completed all non-medical portions of the application process. *See Buchanan*, 85 F.3d at 199.

The summary judgment evidence demonstrates that no conditional offers of employment were made before testing. Defendant's corporate representative testified that no offers of employment were made to the Plaintiffs before the testing in question. Dkt. No. 33-5 at 10:3-11:18; 39:4-13. In a letter from the Defendant to the IRS dated January 24, 2014, Defendant also wrote that "[Defendant] has made no offers to any incumbent individuals and does not intend to make such offers until the vetting process is completed. At that time all incumbent individuals who meet the standards will be offered a position with [Defendant]." Dkt. No. 33-12. When Defendant did extend conditional offers of employment to incumbent guards, it did so by letter. Dkt. No. 33-13; *see also* Dkt. No. 33-14. The record thus establishes that Plaintiffs were not given conditional offers of employment before the testing at issue.

### b.  Liability Under § 12112(d)

Because Defendant did not extend conditional job offers to Plaintiffs, it was prohibited from conducting a medical examination or making inquiries as to whether any Plaintiff is an individual with a disability, or as to the nature or severity of such disability. 42 U.S.C. § 12112(d)(2)(A). Defendant does not dispute that it ordered applicants, including Plaintiffs, to undergo pre-employment testing consisting of a medical examination followed by a physical fitness test. Dkt. No. 51 at 5-6, ¶ 7; Dkt. No. 33-8. Defendant thus implicitly concedes that it violated the ADA when it ordered Plaintiffs to complete a pre-offer medical examination consisting of "vision, hearing, blood pressure, EKG, and other tests." Dkt. No. 51 at 5. *See EEOC v. Grane Healthcare Co.*, 2 F. Supp. 3d 667, 681 (W.D. Pa. 2014) ("A violation of § 12112(d) occurs as soon as an employer conducts an unlawful medical examination or initiates a prohibited medical inquiry.").

Defendant argues that Plaintiffs' motion should be denied because Plaintiffs have not provided any competent summary judgment evidence showing that any violation of § 12112(d) was a legal and proximate cause of their damages. Dkt. No. 51 at ¶ 5. Defendant contends that Plaintiffs conflate prohibited pre-employment medical examinations with permitted pre-employment physical fitness testing and thus have offered "no competent summary judgment evidence demonstrating a causal connection between the *medical examinations* and their damages." Dkt. No. 51 at ¶ 9.

As discussed above, the EEOC Guidance provides that certain tests generally are not considered medical examinations and thus may be conducted, including "physical agility tests, which measure an employee's ability to perform actual or simulated job tasks, and physical fitness tests, which measure an employee's performance of physical tasks, such as running or lifting, as long as these tests do not include examinations that could be considered medical (e.g., measuring heart rate or blood pressure)." EEOC *Medical Examination Guidance*. Defendant argues that Plaintiffs' motion makes no showing that the physical fitness portion of the testing conducted by OHS constitutes an impermissible medical examination, and by conflating the two portions of the testing, Plaintiffs have not conclusively established a causal connection between any violation of § 12112(d) and Plaintiffs' injuries. Dkt. No. 51 at ¶¶ 9-10.

Defendant cites the Pass/Fail Chart, noting that it lists a single column titled "Took Physical" along with a corresponding column indicating "Pass/Fail," rather than having two columns distinguishing between the separate portions of the OHS testing: the medical examination and the physical fitness test. *Id*. at ¶¶ 9-11. Defendant also submits records it obtained from OHS contradicting the data in the Chart, arguing that the Chart is unreliable and cannot serve as

competent summary judgment evidence of a causal connection between any alleged violation of the ADA and any of the Plaintiffs' injuries. *Id*. at ¶ 11.[7]

Plaintiffs reply that both components of the tests qualify as medical examinations. Dkt. No. 66 at 3-4. Both portions were administered and interpreted by medical professionals in a medical setting, all of which weigh in favor of concluding that they were medical examinations. *Id*. at 3. Plaintiffs also contend that the entire testing procedure was designed to assess whether applicants could meet certain medical and physical standards, not whether they could perform the job duties of security guards. *Id*.; *see also* Dkt. No. 33-6 at 13:14-15:8. Plaintiffs concede, however, that several factors weigh against a finding that the physical fitness test was a medical examination, including that it was not invasive, did not measure physiological responses, and did not use medical equipment. *Id*. at 4. Overall, Plaintiffs argue, a majority of factors support a finding that the physical fitness test constitutes a medical examination, and that the selection testing as a whole sought information on an applicant's physical or mental impairments or health. *Id*. Plaintiffs' do not address the discrepancies between the Pass/Fail Chart and OHS documents submitted by Defendant, or Defendant's argument that there is no competent summary judgment evidence that any Plaintiff actually took and failed a prohibited examination and was denied employment by Defendant as a result.

The Court finds that, while Plaintiffs have demonstrated that Defendant violated § 12112(d) by ordering pre-offer medical examinations, Plaintiffs have not provided sufficient summary

---

[7] *See* Dkt. No. 51-8 at 11-15 (certificate of medical examination for Plaintiff Harold Dickerson, indicating he passed the medical examination); Dkt. No. 51-9 (OHS record for Plaintiff Armando Gonzalez, indicating he did not take the physical fitness test due to high blood pressure); Dkt. No. 51-10 (OHS record for non-party Sharon Spence, indicating she passed a medical examination but did not pass the physical fitness test); Dkt. No. 51-11 at 11 (OHS record for Plaintiff Jerry Head, indicating he took and did not pass the physical fitness test); Dkt. No. 51-12 at 12-17 (certificate of medical examination for Plaintiff Tony Hernandez, indicating he took and passed the medical examination, but failed the physical fitness test).

judgment evidence to demonstrate causation as a matter of law. Defendant has raised issues of fact regarding Plaintiffs' conflation of the medical examination and physical fitness test and has controverted the Pass/Fail Chart with credible contradictory evidence. *See* Dkt. No. 33-9; Dkt. No. 51 at ¶ 11.[8]

In moving for summary judgment, the Plaintiffs bear the burden to identify with specificity the summary judgment evidence of record proving each element of his or her claim. Viewing all inferences in the light most favorable to Defendant as the non-movant, the Court finds that Plaintiffs have not met their burden with respect to the elements of injury and causation as to each of their claims and therefore are not entitled to summary judgment with regard to their ADA claim.

## 2. Title VII

Plaintiffs Michelle Sorber and Margret Melton assert Title VII claims against Defendant, alleging that the challenged testing had a disparate impact on women. Title VII prohibits intentional discrimination on the basis of race, color, religion, sex, or national origin, as well as, in some cases, employment practices "that are not intended to discriminate but in fact have a disproportionately adverse impact on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). A prima facie disparate impact claim under Title VII requires that a plaintiff (1) identify the challenged employment practice or policy, (2) demonstrate a disparate impact on a protected group, and (3) demonstrate a causal connection between the

---

[8] Plaintiffs offer some evidence tending to demonstrate a causal connection between the violation and their alleged injuries. *See* Dkt. No. 33-5 at 37:22-25 ("Q: Can we agree that each of the 13 plaintiffs was not hired either because of not passing or not taking the medical and physical agility test? A: I think so."); Dkt. No. 33-15 (rejection letter to Plaintiff Gonzalez stating that Defendant is "unable to extend an offer of employment to [Gonzalez] at this time due to an inability to meet the mandated physical requirements imposed by the Internal Revenue Service for the position for which [Gonzalez] applied"); Dkt. No. 33-18 ¶¶ 6, 15, 16 (stating that any incumbent guard who did not pass the medical examination and physical fitness testing was not further considered for employment). But this generalized evidence does not establish causation as a matter of law for each individual Plaintiff and fails to overcome the challenges raised by Defendant's response.

challenged practice and the disparate impact. *Stout v. Baxter Healthcare Corp.,* 282 F.3d 856, 860 (5th Cir. 2002). If the plaintiff makes a prima facie case of disparate treatment, the defendant "can rebut a prima facie showing of disparate impact by proving that the challenged policy is a business necessity." *Pacheco v. Mieta*, 448 F.3d 783, 787 (5th Cir. 2006).

Sorber and Ms. Melton allege that "Defendant's testing produced extreme adverse impact against women: no female incumbents passed the test, while male incumbents passed the test at a 65% rate." Dkt. No. 33 at 10. Sorber and Ms. Melton assert that the difference between these pass rates constitutes proof of disparate impact under the EEOC's interpretative four-fifths rule. *Id*. According to Sorber and Ms. Melton, there is no fact issue as to causation for their Title VII claim because "Defendant has admitted that the sole basis for the adverse action taken against the Plaintiffs was the illegal testing." Dkt. No. 33 at 10.

Defendant first challenges Sorber and Ms. Melton's standing to bring a Title VII claim because Sorber and Ms. Melton did not actually take the tests at issue. Dkt. No. 51 at ¶ 15; Dkt. No. 1 at ¶¶ 20, 21. At a minimum, standing requires that a plaintiff has suffered an injury in fact and that there is a causal connection between the injury and the conduct complained of. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In other words, the injury "has to be fairly traceable to the defendant's conduct." *Id.* (cleaned up).

Sorber and Ms. Melton argue that because the Executive Order required Defendant make them bona fide offers of employment as long as they were "qualified," they can establish causation despite having not taken the test. Dkt. No. 54 at 2-3; Dkt. No. 59 at 3-4. According to Sorber and Ms. Melton, there is no dispute that they are "qualified" for the security guard position and would have passed a job-related test because they "had effectively been performing that job for years." *Id*. Sorber and Ms. Melton also rely on deposition testimony of Defendant's corporate

representative that Defendant did not extend employment offers to Plaintiffs because they failed to take or pass the medical examinations and physical fitness tests. Dkt. No. 33-5 at 37:3-25. Accordingly, Sorber and Ms. Melton argue that but for the challenged test, they would have received an offer of employment, as required by the Executive Order. Dkt. No. 54 at 2-3; Dkt. No. 59 at 3-4.

That Sorber and Ms. Melton held the security guard position before Defendant's award of the IRS Contract alone does not establish that they are qualified for the position under the new IRS Contract or that they would have passed a job-related test. As Defendant points out, the requirements and standards for the security guard position changed when Defendant was awarded the IRS Contract to provide security services. Dkt. No. 70 at ¶ 9. Sorber and Ms. Melton fail to provide sufficient evidence to establish as a matter of law that they are qualified for the security guard position under the new IRS Contract. A question of fact exists as to whether Sorber and Ms. Melton would have been entitled to a right of first refusal under the Executive Order, and thus whether they can establish the causation requirement for their Title VII claims. Accordingly, the Court finds that a genuine issue of material fact exists as to whether Sorber and Ms. Melton have standing to bring their Title VII claims.

### 3. ADEA

All Plaintiffs except Tony Hernandez and Margret Melton bring claims against Defendant under the ADEA, alleging that Defendant's testing had a disparate impact on individuals over the age of forty. The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA claims based on disparate impact are analyzed similarly to those brought under

Title VII; because an individual's age "not uncommonly has relevance to an individual's capacity to engage in certain types of employment," however, disparate-impact liability under the ADEA has a narrower scope. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 240 (2005).

Like their Title VII claims, Plaintiffs' ADEA claims are based on analysis under the four-fifths rule. Dkt. No. 33 at 11. Plaintiffs argue that because the challenged test produced a 52% pass rate for incumbents over the age of forty and a 71% pass rate for those under forty, the test produced an adverse impact on individuals over the age of forty. *Id.*; Dkt. No. 33-9; Dkt. No. 33-10 at 14-15. Defendant challenges Plaintiffs' disparate impact evidence and argues that Plaintiffs have failed to establish causation. Dkt. No. 51 at ¶¶ 21-22.

As detailed above, Plaintiffs have not provided competent summary judgment evidence demonstrating that each Plaintiff took the allegedly discriminatory test and was denied employment by Defendant as a result. Defendant has responded with credible documentary evidence raising genuine issues of fact regarding the reliability of the evidence on which Plaintiffs rely to show causation. The Court finds that the record lacks sufficient summary judgment evidence to find, as a matter of law, that Defendant's alleged discriminatory test is the legal and proximate cause of the Plaintiffs' injuries. Accordingly, Plaintiffs' motion for summary judgment with respect to their ADEA claims is denied.

## IV.    Conclusion

Based on the foregoing, Defendant's Motion to Exclude Testimony from Plaintiffs' Expert, Dr. David Jones, and Request for Hearing (Dkt. No. 34) and Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 33) are **DENIED**.

**SIGNED** on June 1, 2020.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE